1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MILSTEIN JACKSON**
**FAIRCHILD & WADE, LLP**
Gillian L. Wade, State Bar No. 229124
gwade@mjfwlaw.com
Sara D. Avila, State Bar No. 263213
savila@mjfwlaw.com
Marc A. Castaneda, State Bar No. 299001
mcastaneda@mjfwlaw.com
10250 Constellation Blvd., Suite 1400
Los Angeles, CA 90067
Tel: (310) 396-9600
Fax: (310) 396-9635

[Additional counsel on signature page.]

*Attorneys for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTY WILLIAMS, individually and on behalf of all others situated; | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | 1.    Violations of Unfair Competition Law, 'Unfair' Prong, Cal. Bus. & Prof. C. §§ 17200, *et seq*. |
| LOWE'S HOME CENTERS, LLC, a North Carolina limited liability company; | |
| Defendants. | |

Plaintiff KRISTY WILLIAMS ("Plaintiff"), by her undersigned counsel, on behalf of herself and all persons similarly situated, brings this Class Action Complaint against Defendant Lowe's Home Centers, LLC ("Defendant" or "Lowes"), and alleges as follows:

## NATURE OF THE ACTION

1.    Plaintiff brings this action both on her own behalf and on behalf of a class of consumers as defined below to redress the unfair business practices employed by Defendant in connection with its sale of the herbicide Roundup®.

2.    At all relevant times, Defendant's retail stores and website sold various formulations of Roundup® directly to consumers despite Defendant's knowledge Roundup can cause cancer.

3.    Defendant is indeed aware that California has classified glyphosate—the active ingredient in Roundup®—as a chemical known to cause cancer, such as Non-Hodgkin's lymphoma ("NHL").

4.    Defendant is also aware glyphosate is a Class 2A herbicide, meaning the World Health Organization's International Agency for Research on Cancer ("IARC") has determined it is probably carcinogenic to humans.

5.    Defendant has also known Roundup® and other glyphosate-based herbicides have been banned by many countries, regions, and municipalities throughout the world because it is dangerous to human health.

6.    Defendant is further aware that, within the past two years, three California juries found that Roundup® likely caused certain individuals to develop NHL and have awarded nearly $100 million in compensatory damages and over $2 billion in punitive damages collectively.[1]

---

[1] As discussed herein, these awards were later reduced by the trial court. Each case is presently on appeal.

**CLASS ACTION COMPLAINT**

7.    Additionally, Defendant is aware of the tens of thousands personal injury cases brought by individuals who have alleged Roundup® exposure caused their cancer.[2]

8.    Despite      Defendant's      knowledge      of      Roundup®'s      potential carcinogenicity, Defendant has and continues to sell Roundup® without providing consumers with any additional information on its website, store shelves or at the point of sale about the products' potential health risks.

9.    Although the Environmental Protection Agency ("EPA") under the current administration has stated glyphosate is not likely to be carcinogenic to humans, Defendant, at the very least, should inform consumers there is a vigorous scientific dispute over its potential carcinogenicity.

10.    Defendants' conduct—continuing to sell a line of weed killer products despite knowing they may be carcinogenic and without informing consumers about the potential health risks—constitutes an unfair business practice under the Unfair Competition Law, Cal. Bus. & Prof. C. §§ 17200, *et seq*. (the "UCL").

## JURISDICTION AND VENUE

11.    Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"). Defendant is either incorporated and/or has its principal place of business outside the state in which Plaintiff and members of the proposed Class reside. Furthermore, there are more than 100 Class Members and the amount-in-controversy exceeds $5,000,000 exclusive of interest and costs.

12.    This Court has personal jurisdiction over Defendant because Defendant is a foreign corporation authorized to do business in California and has sufficient minimum contacts with California or otherwise intentionally avails itself of the laws and markets of California, through the sale and distribution of their Roundup®

---

[2] Most of these cases were consolidated in a multi-district litigation ("MDL") before Judge Vince Chhabria in the Northern District of California and have recently settled.

**CLASS ACTION COMPLAINT**

products in California, to render the exercise of jurisdiction by the California courts permissible.

13.   Venue is proper in this District under 28 U.S.C. §1391(b) and (c) because Defendant's improper conduct alleged in this complaint occurred in, was directed from, and/or emanated from this judicial district, because Defendant has caused harm to Class Members residing in this district, and/or because Defendant is subject to personal jurisdiction in this district.

## PARTIES

14.   Plaintiff KRISTY WILLIAMS is an individual, a resident of Lake Elsinore, California, and a member of the Class alleged herein.

15.   Defendant LOWE'S HOME CENTERS, LLC is a chain of American hardware stores and warehouses headquartered in Mooresville, North Carolina, which at all times material hereto was conducting business in California, maintained agents for the customary transaction of business in California, and conducted substantial and not isolated business activity within this State.

16.   Defendant is engaged in the marketing, sale, and distribution of a product line of the herbicide Roundup®, which contains the active ingredient glyphosate. All formulations of Roundup® are manufactured by non-parties Monsanto Company ("Monsanto"), Bayer Corporation, and/or Bayer AG.

17.   "Roundup" refers to any and all Roundup®-brand products and other herbicide products containing glyphosate that are sold by Lowes and manufactured by Monsanto Company, Bayer Corporation, and/or Bayer AG.  Roundup includes but is not limited to the following products: Roundup Ready-to-Use Weed & Grass Killer III; Roundup Ready-to-Use Weed & Grass Killer III with Sure Shot Wand; Roundup Ready-To-Use Weed and Grass Killer III with Pump 'N Go 2 Sprayer; Roundup Ready-to-Use Weed & Grass Killer III Refill; Roundup Weed & Grass Killer Concentrate Plus; Roundup Extended Control Weed & Grass Killer Pump N Go II; Roundup Extended Control Weed & Grass Killer Plus Weed Preventer II; Roundup

Ready-To-Use Extended Control Weed and Grass Killer Plus Weed Preventer II with Comfort Wand; Roundup Weed & Grass Killer Super Concentrate; Roundup Concentrate Poison Ivy Plus Tough Brush Killer; Roundup Concentrate Max Control 365; Roundup Ready-To-Use Max Control 365; and Roundup Ready-To-Use Max Control 365 Refill

18.   Defendant transacted and conducted business within the State of California that relates to the allegations in this Complaint.

19.   Defendant derived substantial revenue from goods and products used in the State of California.

20.   Defendant purposefully availed itself of the privilege of conducting activities within the State of California, thus invoking the benefits and protections of its laws.

21.   Defendant advertises and sells goods, specifically Roundup, throughout California and the United States, including in Riverside County, California.

## FACTUAL ALLEGATIONS

**A.    Background on Roundup's Packaging.**

22.   Roundup is sold at Lowes retail locations throughout the United States, including those in California, and on Lowes' website. The content on Roundup's packaging label is not altered between manufacture and points of sale at Defendant's retail locations. An exemplar photograph of the front of Roundup's label is attached hereto as "Exhibit A."

23.   As indicated on Roundup's packaging label, glyphosate is the active ingredient in Roundup. *Id.* Glyphosate is a nonselective herbicide that inhibits plant growth through interference with the production of essential aromatic amino acids. It was discovered to be an herbicide in 1970 and was first brought into the market as Roundup by Monsanto Company ("Monsanto") in 1974.

24.   In addition to the active ingredient glyphosate, Roundup formulations also contain adjuvants and other chemicals, such as the surfactant polyethoxylated

4

tallow amine ("POEA"), which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup formulations are not, in fact, inert and are toxic in their own right.

25.    Roundup's packaging label provides certain warnings, such as, "Keep Out of Reach of Children" and "Caution." But the only hazard identified is that it may cause "moderate eye irritation." *See id*.

26.    This warning gives the false impression eye irritation is the only risk posed by Roundup, when in fact, the Roundup formulation is known to have links to cancer, as discussed more fully herein.

**B.    The IARC Classification of Glyphosate.**

27.    The International Agency for Research on Cancer ("IARC"), an intergovernmental cancer agency within the World Health Organization ("WHO") of the United Nations, was tasked in 2015 with conducting and coordinating research into the causes of cancer it pertained to glyphosate.

28.    In March 2015, an IARC "Working Group" of 17 experts from 11 countries convened to evaluate several insecticides and herbicides, including diazinon, tetrachlorvinphos, malathion, parathion, and glyphosate. The evaluation was based on a cumulative review of all publicly available and pertinent scientific studies. Some of the studies pertained to people exposed to glyphosate through their jobs, such as farmers. Others were experimental studies on cancer and cancer-related effects in experimental systems. The IARC Working Group's full monograph was published on July 29, 2015.

29.    In its monograph, the IARC Working Group classified glyphosate as a Class 2A herbicide, which means it is probably carcinogenic to humans. It concluded non-Hodgkin lymphoma was most associated with glyphosate exposure.

30.    The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

31.   The IARC's conclusions were consistent with scientific developments that had occurred in prior decades.

**C.   Early Studies and Developments Pertaining to Roundup's Carcinogenic Properties.**

32.   As early as the 1980's, Defendant should have been aware of glyphosate's carcinogenic properties.

33.   On March 4, 1985, a group of the EPA's Toxicology Branch published a "consensus review" based on a mouse study conducted by Monsanto in 1983. The review "classified Glyphosate as a Category C oncogen," meaning it is a possible human carcinogen.

34.   However in June 1991, EPA published a memorandum entitled, "Second Peer Review of Glyphosate," which changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions, and the Memorandum itself "emphasized however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

35.   In 1996, the New York Attorney General sued Monsanto for false and misleading advertising by touting its glyphosate-based Roundup products as, e.g., "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

36.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with  New York Attorney General, in which Monsanto agreed to alter the advertising, removing from advertisements that represent, directly or by implication, that the weed killers were biodegradable and environmentally friendly. Monsanto also agreed to pay $50,000 toward New York's costs of pursuing the case. At the time, New York was the only state to object to the advertising claims.

37.   In 1997, Chris Clements, *et al.* published a study entitled, "Genotoxicity of Select Herbicides in *Rana catesbeiana* Tadpoles Using the Alkaline Single-Cell Gel DNA Electrophoresis (Comet) Assay." Genotoxicity refers to the property of chemical agents which cause damage to genetic information within a cell causing mutations, which may lead to cancer.  In Clements' publication, tadpoles were exposed to various herbicides, including Roundup, for a 24-hour period. Roundup-treated tadpoles showed "significant DNA damage when compared with unexposed control animals."

38.   In 1999, Lennart Hardell and Mikael Eriksson published a study entitled, "A Case–Control Study of Non-Hodgkin Lymphoma and Exposure to Pesticides," which consisted of a population-based case–control study in northern and middle Sweden encompassing 442 cases and twice as many controls was performed. Exposure data were ascertained by comprehensive questionnaires, and the questionnaires were supplemented by telephone interviews. The results indicated exposure to glyphosate and other herbicides yielded increased risks for Non-Hodgkin Lymphoma ("NHL").

39.   In 2002, Julie Marc, *et al.* published a study entitled, "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation." The study found Defendant's Roundup caused delays in the cell cycles of sea urchins. It further noted the deregulations of cell cycle checkpoints are *directly linked* to genomic instability, which can generate diseases and cause cancer. The findings led to the conclusion Roundup "causes changes in cell cycle regulation that may raise questions about the effect of this pesticide on human health."

40.   In 2003, A. J. De Roos, et al. published a study entitled, "Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men," which "[r]eported use of several individual pesticides was associated with increased NHL incidence, including . . . glyphosate. A subanalysis of these 'potentially carcinogenic' pesticides suggested a positive trend of risk with exposure

7

**CLASS ACTION COMPLAINT**

to increasing numbers."

41.  In 2004, Julie Marc, *et al.* published another study entitled, "Glyphosate-based pesticides affect cell cycle regulation." In that study, which tested Roundup 3plus on sea urchin eggs, determined "glyphosate-based pesticides are clearly of human health concern by inhalation in the vicinity of spraying," given the "molecular link between glyphosate and cell cycle dysregulation." It observed, "roundup may be related to increased frequency of non-Hodgkin's lymphoma among farmers, citing the study by A. J. De Roos., *et al.*

42.  In 2008, Mikael Eriksson, *et al.* published a study entitled, "Pesticide exposure as risk factor for NHL including histopathological subgroup analysis," based on a case-control study of exposure to various pesticides as a risk factor for NHL. Eriksson's study strengthened previous associations between glyphosate and NHL.

43.  In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

44.  Also in 2009, Nora Benachour and Gilles-Eric Seralini published a study entitled, "Glyphosate formulations induce apoptosis and necrosis in human umbilical, embryonic, and placental cells," which examined the effects of four different Roundup formulations on human umbilical, embryonic, and placental cells—at dilution levels far below agricultural recommendations. The study found the formations caused cell death in a few hours in a cumulative manner, caused DNA damage, and found that the formulations inhibit cell respiration. In addition, it was shown the mixture of the components used as Roundup adjuvants, particularly POEA *amplified the action of the glyphosate*. The Roundup adjuvants actually changed human cell permeability and increased the toxicity of glyphosate alone.

1
2

**D.    Glyphosate-Based    Herbicides,    Including    Roundup,    are    Banned Throughout the World.**

3
4

45.    Following the IARC's report on glyphosate, several countries have issued outright bans or restrictions on glyphosate herbicides, including Roundup.

5
6
7

46.    In May 2015, the Netherlands banned all non-commercial use of glyphosate.    *See*    https://www.collective-evolution.com/2015/05/30/why-the-netherlands-just-banned-monsantos-glyphosate-based-herbicides/.

8
9
10
11

47.    In 2016, Italy adopted a law prohibiting the use of glyphosate in areas frequented by the public or by "vulnerable groups" including children and the elderly and in    the    pre-harvest    phase    in    agriculture.    *See* https://www.soilassociation.org/news/2016/august/italy-bans-toxic-glyphosate/.

12
13
14

48.    In June 2017, the Flemish government approved a ban on glyphosate for individual-use.    *See*    https://www.brusselstimes.com/all-news/belgium-all-news/43150/flemish-government-approves-ban-on-glyphosate-for-individuals/.

15
16
17
18
19

49.    In September 2018, the agriculture ministry of the Czech Republic stated the country would ban the blanket use of glyphosate as a weedkiller and as a drying agent.    *See*    https://phys.org/news/2018-09-czech-republic-restrict-glyphosate-weedkiller.html.    The    ban    came    into    effect    on    January    1,    2019.    *See* http://www.arc2020.eu/czech-out-this-roundabout-way-to-not-ban-roundup/.

20
21
22
23

50.    In October 2018, the Indian state of Punjab banned the sale of glyphosate. *See*  https://www.thehindu.com/news/national/other-states/punjab-government-bans-sale-of-herbicide/article25314146.ece. And in February of 2019, the Indian state of Kerala followed suit, issuing a ban on the sale, distribution and use of glyphosate. *See*

24
25

https://www.thenewsminute.com/article/kerala-government-bans-glyphosate-deadly-weed-killer-96220.

26
27
28

51.    In January 2019, French authorities banned the sale of Roundup following a court ruling that regulators failed to take safety concerns into account when clearing the widely used herbicide. *See* https://www.france24.com/en/20190116-weedkiller-

9

roundup-banned-france-after-court-ruling. In April 2019, a French appeals court ruled Bayer's Monsanto business was liable for the health problems of a farmer who inhaled Roundup. *See* fhttps://www.insurancejournal.com/news/international/2019/04/11/523456.htm.

52.   In March 2019, Vietnam announced it has banned the import of all glyphosate-based herbicides. *See* https://sustainablepulse.com/2019/03/25/vietnam-bans-import-of-glyphosate-herbicides-after-us-cancer-trial-verdict/#.XS-xCT9Kh9O.

53.   In July 2019, Austria's Parliament passed a bill banning all uses of glyphosate. *See* https://www.reuters.com/article/us-austria-glyphosate/austrian-parliament-backs-eus-first-total-ban-of-weedkiller-glyphosate-idUSKCN1TX1JR. Although the ban was supposed to take effect on January 1, 2020, Austria's Chancellor refused to sign it into law due to a legal technicality. *See* https://www.reuters.com/article/us-austria-glyphosate/austrian-leader-blocks-ban-on-weedkiller-glyphosate-citing-technicality-idUSKBN1YD11Z.

54.   In January 2020, Luxembourg issued a total ban on glyphosate. *See* https://www.brusselstimes.com/all-news/eu-affairs/92006/luxembourg-will-be-first-eu-country-to-totally-ban-glyphosate/.

55.   Several municipalities and regions in Spain, the United Kingdom, and the United States, have also banned glyphosate herbicides.

**E.   Monsanto Loses Three Verdicts after Roundup is Found to Cause Cancer in Humans.**

56.   On August 10, 2018, a unanimous California jury in *Johnson v. Monsanto Co.,* No. CGC16550128 (Cal. Super. Ct., Cnty. of S.F.) found Monsanto's Roundup and Ranger Pro herbicides were unsafe and were a substantial factor in causing harm to the plaintiff.  The jury also found Monsanto failed to adequately warn customers of the risks associated with its Roundup and Ranger Pro products, and that the company acted with malice or oppression. The jury awarded the plaintiff a total of

$289 million, with $250 million in punitive damages and $39.25 million in compensatory damages. The court later reduced the punitive damages award, bringing the total award to $78.5 million. Monsanto has appealed the judgment and the matter is currently before the California Court of Appeal.

57.    On March 27, 2019, a unanimous California jury in *Hardeman v. Monsanto Co.*, No. 3:16-cv-00525-VC (N.D. Cal.) found Monsanto liable for failing to warn Roundup could cause cancer, liable for negligence, and liable in a design defect claim. The jury awarded the plaintiff a total of $80.27 million, with $75 million in punitive damages and $5.27 million in compensatory damages. The court later reduced the punitive damages award, bringing the total award to $25.27 million. Monsanto has appealed the judgment and the matter is currently before the Ninth Circuit Court of Appeals.

58.    On May 13, 2019, a California jury found Monsanto likely caused a couple's cancer in *Pilliod v. Monsanto Co.,* No. RG17862702 (Cal. Super. Ct., Cnty. of Alameda). The jury found on a preponderance of the evidence Roundup was a significant contributing factor in causing the plaintiff's NHL. The jury awarded the plaintiffs a total of $2.055 billion, with $2 billion in punitive damages and $55 million in compensatory damages. The court later reduced the punitive and compensatory damages awards, bringing the total award to $87 million. Monsanto has appealed the judgment and the matter is currently before the California Court of Appeal.

## F.    Bayer Agrees to Pay Over $10 Billion to Settle Personal Injury Suits

59.    Tens of thousands of individuals have filed personal injury lawsuits against Monsanto and Bayer on grounds Roundup exposure caused their Non-Hodgkin's lymphoma.

60.    Many of these lawsuits, filed in federal courts throughout the United States, were consolidated before Judge Vince Chhabria in an multi-district litigation ("MDL"), entitled *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal.).

61.    On June 24, 2020, Bayer announced it had reached a settlement with the plaintiffs in the MDL. The settlement would bring closure to approximately 75% of the current Roundup litigation, involving approximately 125,000 filed and unfiled claims overall. The settlement is subject to approval by Judge Chhabria.

62.    Under the terms of the settlement, Bayer agreed to make a payment of $8.8 billion to $9.6 billion to resolve the current Roundup personal injury litigation, including an allowance expected to cover unresolved personal injury claims, and $1.25 billion to support a separate class agreement to address potential future litigation.

63.    Defendant Monsanto has admitted there is a scientific dispute over Roundup's potential carcinogenicity. Indeed, the separate agreement in the MDL includes the establishment of a class of potential future plaintiffs (the "MDL Class") and the creation of an independent Class Science Panel. If the MDL settlement is approved, the Class Science Panel would determine whether Roundup can cause non-Hodgkin's lymphoma (NHL), and if so, at what minimum exposure levels. Monsanto and Bayer (and the members of the MDL Class) will be bound by the Class Science Panel's determination on this scientific dispute.

64.    If the Class Science Panel determines that a causal connection between Roundup and NHL has not been established, MDL Class Members will be barred from claiming otherwise in any future litigation against the company. If the Class Science Panel determines that a causal connection between Roundup and NHL has been established, Monsanto will be barred from claiming otherwise in any future litigation against the company

65.    The proposed establishment of the Class Science Panel and the $1.25 billion underscores the fact that there is a still a dispute as to whether there is a causal connection between Roundup and NHL. Yet Monsanto and Bayer continue to deny such a link and refuse to disclose the link to EPA and consumers. As Judge Chhabria has stated, there is "at least a strong argument that the only reasonable conclusion one

**CLASS ACTION COMPLAINT**

could draw right now is that we don't yet know" whether glyphosate-based formulations cause NHL.

**G.   California's Classification of Glyphosate as a Chemical Known to Cause Cancer.**

66.   On July 7, 2017, following the IARC's classification of glyphosate, California's Office of Environmental Health Hazard Assessment (OEHHA) listed glyphosate as a chemical known to the State of California to cause cancer, pursuant to the Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65").

67.   Proposition 65 prohibits retailers and manufacturers from knowingly and intentionally exposing California consumers to a chemical known to the State of California to cause cancer or developmental or reproductive harm without first providing a "clear and reasonable warning."

68.   In response to OEHHA's inclusion of glyphosate on the Proposition 65 list, Monsanto, CropLife America, and several growers associations filed a motion alleging the IARC classification of glyphosate is contrary to the international scientific consensus and that requiring a Proposition 65 warning would be misleading to the ordinary consumer.

69.   On February 26, 2018, the Eastern District Court of California issued a preliminary injunction precluding OEHHA from enforcing its Proposition 65 warning requirements against glyphosate registrants, which would have taken effect on July 7, 2018. This injunction remains in place today. The Court however did not rule that glyphosate should be removed from the Proposition 65 list as a chemical known to the State of California to cause cancer.

70.   On August 7, 2019, EPA's Office of Pesticide Program ("OPP") issued a letter to registrants of glyphosate products (the "OPP Letter") stating a Proposition 65 warning statement on glyphosate-based products would be "false and misleading" and would render them misbranded under FIFRA. The OPP letter was not the product of any formal proceedings, nor was it published in the Federal Register.

71.   Plaintiff's Complaint does not arise under Proposition 65, nor does it seek to vindicate a right created by Proposition 65.

## H.   The EPA's Registration Review for Glyphosate.

72.   Since glyphosate's first registration, EPA has reviewed and reassessed its safety and uses, including undergoing registration review, a program that re-evaluates each registered pesticide on a 15-year cycle.

73.   In January 2020, after receiving and considering public comments, EPA issued its Interim Registration Review Decision for glyphosate, finding "there are no risks to human health from the current registered uses of glyphosate and that glyphosate is not likely to be carcinogenic to humans." EPA stated it "will continue to monitor the open literature for studies that use scientifically sound and appropriate methodology and relevant routes of exposure that have the potential to impact the risk evaluation of glyphosate."[3]

74.   The EPA's review of glyphosate, however, was based on an incomplete and distorted factual record, largely due to efforts on the part of Monsanto to conceal glyphosate's risks. As described herein, Monsanto withheld relevant scientific evidence from the EPA, refused to conduct glyphosate studies requested by EPA, and falsely bolstered the safety profile of glyphosate-based herbicides by ghostwriting scientific articles ultimately relied upon by EPA.

### 1.   Monsanto Manipulated the Science to Conceal Glyphosate's Risks

75.   EPA processed the initial petition and registration for glyphosate in the 1970s. Its approval of glyphosate was predicated on studies conducted on Monsanto's behalf from a laboratory embroiled in scientific fraud. From the time it came to market

---

[3] As of March 2020, multiple groups have sued EPA over its Interim Registration Review Decision for glyphosate. These groups include Center for Food Safety, Beyond Pesticides, the Rural Coalition, Organización en California de Lideres Campesinas, the Farmworker Association of Florida, Natural Resources Defense Council, and Pesticide Action Network North America.

**CLASS ACTION COMPLAINT**

in 1974 until 1983, glyphosate's safety was unsupported by any valid carcinogenic studies.

76.    By 1983, EPA required Monsanto to redo toxicological and carcinogenicity studies on glyphosate. Monsanto conducted its first valid mouse study in 1983, to determine whether glyphosate was carcinogenic in rodents (and therefore a likely human carcinogen), the study reported rare tumors in mice as exposures to glyphosate increased. This was strong evidence glyphosate causes cancer in mammals. The study caused EPA to designate glyphosate as possibly carcinogenic to humans in 1985 (as previously discussed herein).

77.    Monsanto then hired a pathologist to undermine EPA's conclusions by reviewing the pathology and "discovering" a tumor in the control group. Prior to that "discovery," Monsanto wrote internally that the only way to get EPA to change its classification was to find a tumor in the control group—a result pre-determined by Monsanto—which is exactly what the retained pathologist ended up finding. EPA ultimately sided with Monsanto, even after the agency's own scientific advisory panel ("SAP") recommended that the studies needed repeating—which Monsanto refused to do.

78.    Beginning in the 1990s, numerous studies found an association between Roundup and Non-Hodgkin Lymphoma. In response, Monsanto hired Dr. James Parry, a world-renowned genotoxicologist, to rebut the growing scientific consensus Roundup is genotoxic. This tactic backfired: Following his review, Dr. Parry provided a report to Monsanto that "glyphosate is capable of producing genotoxicity both in vivo and in vitro . . . ."  Dr. Parry recommended that Monsanto conduct research on the genotoxicity of glyphosate-based herbicides; the mechanisms giving rise to genotoxicity; and the relevance of these mechanisms to the safety of glyphosate-based herbicides.

79.    Monsanto decided not to conduct the research Dr. Parry asked it to perform. Dr. Parry offered to conduct the research himself, but Monsanto refused.

Monsanto's goal was not actually to determine whether glyphosate-based herbicides caused cancer but rather to find an expert that could influence regulators when genotoxicity issues arise. Monsanto failed to produce the Parry Report to EPA as required under 40 C.F.R. § 159.158. Because Dr. Parry never came around to Monsanto's view of the science, Monsanto would not let him speak to regulators and his report was never submitted to EPA.

### 2. Monsanto Ghostwrote Scientific Articles to Misrepresent that Roundup is Safe.

80.   Monsanto has also engaged in the practice of "ghostwriting" scientific papers to establish the safety of glyphosate-based herbicides, which, when published, appear to be authored by independent academic scientists.

81.   A noteworthy example is a paper published in 2000 purportedly written by G. M. Williams, *et al.* entitled, "Safety evaluation and risk assessment of the herbicide roundup and its active ingredient, glyphosate, for humans." This paper concluded "Roundup herbicide does not pose a health risk to humans." Although no Monsanto employee is listed as an author, William Heydens, a Monsanto employee, admits that he wrote the manuscript and provided final edits to the paper. EPA has consistently relied on this paper when considering the safety of glyphosate-based herbicides.

82.   Another example of Monsanto's surreptitious involvement in the science of glyphosate can be found in a memo dated August 4, 2015 by Monsanto scientist David Saltmiras, stating he "ghost wrote cancer review paper Greim, et al. (2015)." That paper, entitled, "Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies," concluded "glyphosate does not present concern with respect to carcinogenic potential in humans." EPA has consistently relied on this paper when considering the safety of glyphosate-based herbicides.

83.     Immediately after IARC deemed glyphosate a probable carcinogen, Monsanto devised a response plan that included convening an expert panel to "[p]ublish comprehensive evaluation of carcinogenic potential by credible scientists" that could later be used for litigation support. It worked with Intertek, an industry consultancy firm, to create a false impression that the expert panel was independent.

84.     On September 28, 2016, the "independent" expert panel published its conclusions in the journal Critical Reviews in Toxicology, in a paper entitled "A review of the carcinogenic potential of glyphosate by four independent expert panels and comparison to the IARC assessment." The paper concluded glyphosate was "unlikely to pose a carcinogenic risk to humans."

85.     Included in the paper was a "Declaration of Interest," which stated: "[t]he Expert Panelists . . . were not directly contacted by the Monsanto Company" and that "neither any Monsanto company employees nor any attorneys reviewed any of the Expert Panel's manuscripts prior to submission to the journal." These statements were blatantly false. Monsanto recruited, selected, and had direct contact with the experts, some of them receiving payments from Monsanto. Moreover, Monsanto was engaged in organizing, reviewing, and editing of the drafts, and had ultimate authority over the paper's content.

86.     The foregoing represent just a handful of the many scientific articles ghostwritten by Monsanto to manipulate the scientific debate about glyphosate-based herbicides, including Roundup, and to prevent regulators like EPA from learning their true risks.

## I.     Lowes' Failure to Warn Consumers of Roundup's Carcinogenic Properties.

87.     Although Defendant is not involved in the manufacture and design of the Roundup products, Defendant is responsible for passing Roundup down the line to consumers by making it available for purchase, and thus plays an integral role in placing Roundup into the stream of commerce.

88.   Indeed, Defendant is responsible for the representations it makes (or chooses not to make) on its website and on store shelves regarding Roundup's safety.

89.   Customers rely on Defendant—one of the largest retailers in the United States—to offer quality products from trusted brands. But instead of putting its customers' safety first and removing Roundup from its stores or informing consumers about Roundup's potential health risks, Lowes sold a potentially deadly product for its own direct financial benefit.

90.   Defendant was aware of the present and substantial danger to consumers while using Roundup in an intended and reasonably foreseeable way and has not alerted consumers of its potential health risks.

**J.    Plaintiff's Purchase of Roundup from Defendant.**

91.   Plaintiff purchased two bottles of Roundup Extended Control Weed & Grass Killer Plus Weed Preventer II, one bottle of Roundup Ready-To-Use Weed and Grass Killer III with Pump 'N Go 2 Sprayer, and one bottle of Roundup Ready-to-Use Weed & Grass Killer III during the Class Period.[4] These purchases were made at a Lowes store located in Lake Elsinore, California.

92.   Defendant did not provide Plaintiff with any information regarding the carcinogenic nature of Roundup.

93.   Defendant could have, but failed to provide such information by, for example, displaying it on the shelves where Roundup was sold (or, for some consumers, on the product pages online).

94.   Had Plaintiff known of the carcinogenic properties of Roundup and its links to cancer, she would not have purchased it.

95.   Bayer, the company which bought Monsanto last year, recently announced plans to invest $5.6 billion over the next decade developing weed killers. Plaintiff may purchase Roundup again if she believes Roundup has been reformulated to remove or mitigate its potential risks.

---

[4] The term "Class Period" as used herein shall mean since July 6, 2016.

18

**CLASS ACTION COMPLAINT**

1

## CLASS ALLEGATIONS

2

96.   Plaintiff brings this class action pursuant to Rule 23(b)(2) and 23(b)(3) of

3

the Federal Rules of Civil Procedure on behalf of herself and all members of the

4

following Class (the "Class"):

5

**All persons in the State of California who purchased at least one**

6

**Roundup product from Lowe's Home Centers, LLC, for personal use**

7

**and not for re-sale, since July 6, 2016.**

8

97.   Subject to additional information obtained through further investigation

9

and discovery, the foregoing definition of the Class may be expanded or narrowed by

10

amendment.

11

98.   Specifically excluded from the proposed Class is Defendant, its officers,

12

directors, agents, trustees, parents, children, corporations, trusts, representatives,

13

employees, successors, assigns, or other persons or entities related to or affiliated with

14

Defendant and/or its officers and/or directors, or any of them. Also excluded from the

15

proposed Class are the Court, the Court's immediate family and Court staff.

16

### Federal Rules of Civil Procedure, Rule 23(a) Factors

17

99.   **Numerosity**. Membership in the Class is so numerous that separate

18

joinder of each member is impracticable. The precise number of Class members is

19

unknown at this time but can be readily determined from Defendant's records.

20

Plaintiff reasonably estimates that there are tens of thousands of persons in the Class.

21

100. **Adequacy of Representation**. Plaintiff will fairly and adequately

22

represent and protect the interests of the members of the Class. Plaintiff has retained

23

counsel highly experienced in complex consumer class action litigation and intends

24

to prosecute this action vigorously. Plaintiff is a member of the Class described herein

25

and does not have interests antagonistic to, or in conflict with, the other members of

26

the Class.

27

28

**CLASS ACTION COMPLAINT**

101. **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class purchased Defendant's Roundup products without being informed it contains carcinogenic properties.

102. **Existence and Predominance of Common Questions of Law and Fact.** There are numerous and substantial questions of law and fact common to all Class Members sufficient to satisfy Rule 23(a), and that control this litigation and predominate over any individual issues for purposes of Rule 23(b)(3). Included within the common questions are:

1. Whether Defendant's Roundup products, including their active ingredient glyphosate, contains carcinogenic properties and/or poses a risk of cancer;

2. Whether Defendant failed to inform consumers of Roundup's health risks;

3. Whether Defendant's failure to inform consumers of Roundup's health risks is material to reasonable consumers;

4. Whether Defendant's selling, marketing and/or advertising of Roundup caused Plaintiff and the Class to suffer economic harm;

5. Whether Defendant violated California Business and Professions Code section 17200, *et seq.*;

6. Whether Plaintiff and the Class are entitled to injunctive relief;

7. Whether Plaintiff and the Class are entitled to restitution and if so, the appropriate measure; and,

8. Whether Plaintiff and the Class are entitled to declaratory and/or other equitable relief.

## Federal Rules of Civil Procedure, Rule 23(b)(2) Factors

103. Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions

by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendant

104. Injunctive relief is necessary to prevent further fraudulent and unfair business practices by Defendant. Money alone will not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to sell Roundup without informing its customers that using Roundup may be carcinogenic.

## **Federal Rules of Civil Procedure, Rule 23(b)(3) Factors**

105. **Common Issues Predominate**: As set forth in detail hereinabove, common issues of fact and law predominate because Plaintiff's claims are based on a deceptive common course of conduct. Whether Defendant's conduct is likely to harm reasonable consumers and violate the UCL is common to all members of the Class and are the predominating issues, and Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

106. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

1. Given the size of the claims of individual Class members, as well as the resources of Defendant, few Class members, if any, could afford to seek legal redress individually for the wrongs alleged herein;

2. This action will permit an orderly and expeditious administration of the claims of Class members, will foster economies of time, effort, and expense ad will ensure uniformity of decisions;

3. Any interest of Class members in individually controlling the prosecution of separate actions is not practical, creates the potential for inconsistent or contradictory judgments and would create a burden on the court system; and

**CLASS ACTION COMPLAINT**

4.  Without a class action, Class members will continue to suffer damages, Defendant's violations of law will proceed without remedy, and Defendant will continue to reap and retain the substantial proceeds derived from its wrongful and unlawful conduct. Plaintiff and Class members have suffered damages as a result of Defendant's unlawful and unfair conduct. This action presents no difficulties that will impede its management by the Court as a class action.

107. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

108. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

### FIRST CAUSE OF ACTION

**Violations of Unfair Competition Law (UCL) – Unfair Prong**

**California Business and Professions Code § 17200, et seq.**

**(on behalf of the Class)**

109. Plaintiff hereby incorporates by reference each of the proceeding allegations as if fully set forth herein.

110. Individually and on behalf of the proposed Class, Plaintiff brings this claim under the "unfair" prong of California's Unfair Competition Law, Business and Professions Code section 17200, *et seq.*

### Costco's Unfair Conduct

111. As detailed above, Defendant's unfair conduct includes selling, marketing and advertising Roundup without informing consumers that it poses a cancer risk—or at the very least, that there is a scientific dispute over its potential carcinogenicity.

112. Defendant's business practices, as alleged herein, are unfair for the following reasons: First, the injury to the consumer is substantial. Defendant had

22

knowledge of Roundup's potential health risks and nonetheless continued selling it directly to consumers. And in doing so, Defendant sold the harmful, potentially carcinogenic product without providing any warning as to its risks. Second, the injury is not outweighed by any countervailing benefits to consumers or competition. There can be no benefit to consumers or competition where Defendant has withheld information that is material and indeed critical to consumers' purchasing decisions. Third, consumers could not reasonably have avoided the injury because Defendant has deceived consumers by selling a product with links to cancer without disclosing the known health risks, as set forth herein.

113. Defendant's business practices are also unfair because its conduct (described above) is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. The gravity of the harm to consumers is not outweighed by the utility of Defendant's conduct.

114. Lastly, Defendant's business practices (described above) are unfair because they undermine public policy, which is tethered to specific constitutional and statutory provisions, including California's consumer protection statutes.

115. The unfairness of Defendant's business practices is underscored by its position in the marketplace to exert pressure on the makers of Roundup to include appropriate health and safety warnings on the weed killer's packaging label.

116. Similarly, Defendant is in a position to protect consumers from the risks of Roundup by simply not selling the product or, alternatively, providing a point of purchase shelf-warning, and can adjust the costs of such protection in the course of its ongoing business relationships with Bayer and Monsanto, yet unfairly chooses not to.

117. Defendant's conduct was and is uniform, material, and constitutes a continuing course of conduct of unfair competition.

**Plaintiff's Loss of Money or Property**

**CLASS ACTION COMPLAINT**

118. Plaintiff has suffered injury in fact and has lost money or property as a result of Defendant's actions as set forth herein. Specifically, on four occasions during the Class Period, Plaintiff purchased Roundup from Defendant for her own personal use.

119. When purchasing Roundup, Plaintiff was not aware it could be harmful to her health. Plaintiff would not have purchased Roundup from Defendant had she known it had carcinogenic properties.

### Relief Sought

120. Pursuant to section 17203 of the UCL, Plaintiff seeks an order of this Court enjoining Defendant from engaging in the unfair business practices alleged herein in connection with the sale of Roundup. For example, while the form and scope of injunctive relief is within the Court's sole discretion, Plaintiff alleges that an order enjoining Defendant from selling Roundup may be appropriate. Alternatively, an order requiring Defendant to provide information to consumers about Roundup's potential health risks—including, e.g., the fact that there is a scientific dispute over its potential carcinogenicity—at the point of sale, on store shelves and/or on product webpages may also be appropriate. Such an order would enhance safety since Defendant is in an ideal position in the marketplace to warn its customers about Roundup's potential safety risks. Additionally, Defendant may be the only entity in the distribution chain reasonably available to many California consumers.

121. Furthermore, Plaintiff seeks an order awarding Plaintiff and the Class restitution of the money wrongfully acquired by Defendant from Class Members by means of the unfair business practices alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and on behalf of the members of the Class defined herein, prays for judgment and relief on all Causes of Action as follows:

A.    An order certifying that the action may be maintained as a Class Action;

B.     An order enjoining Defendant from pursuing the policies, acts, and practices complained of herein;

C.     Pre-judgment interest from the date of filing this suit;

D.     Restitution;

E.     Reasonable attorneys' fees;

F.     Costs of this suit; and

G.     Such other and further relief as the Court may deem necessary or appropriate.


## JURY DEMAND

Plaintiff and the Class by counsel hereby request a trial by jury as to all issues so triable.


July 6, 2020                                         Respectfully submitted,

Gillian L. Wade
Sara D. Avila
Marc A. Castaneda
**MILSTEIN JACKSON FAIRCHILD & WADE, LLP**

Spencer Sheehan (to apply *pro hac vice*)
**SHEEHAN & ASSOCIATES, P.C.**
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800

Lydia Sturgis Zbrzeznj (to apply *pro hac vice*)
**SOUTHERN ATLANTIC LAW GROUP, PLLC**
99 6th Street SW
Winter Haven, Florida 33880
Telephone: (863) 656-6672
Facsimile: (863) 301-4500

*Counsel for Plaintiff and the Proposed Class*

25

**CLASS ACTION COMPLAINT**